## MORSE v. SINCLAIR AUTOMOBILE SERVICE CORPORATION.*

## SINCLAIR AUTOMOBILE SERVICE CORPORATION v. MORSE.

### No. 7926.

Circuit Court of Appeals, Fifth Circuit.

Nov. 16, 1936.

*Rehearing denied Dec. 18, 1936.

Houston White and Edwin Pearce, both of Atlanta, Ga., for appellant and cross-appellee.

Frank C. Tindall, of Atlanta, Ga., for appellee and cross-appellant.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit was for damages for the death of plaintiff's daughter through the alleged negligence of defendant. The claim was that while in the act of leaving defendant's premises where she had gone with Arthur Tolchin, one of its regular customers, to park his car, she was caused by the negligence of defendant to lose her footing and fall into a grease pit maintained by defendant for greasing automobiles.

The defense was that the decedent was a mere licensee, to whom defendant owed no duty of care, but only the duty to refrain from wantonly injuring her. In addition, defendant urged that no case for recovery through negligence had been made out. The District Judge overruled defendant's demurrer and also its motion to direct at the close of plaintiff's case. When, however, all the evidence was in and defendant at the conclusion of its own case moved again for the direction, this motion was granted and a verdict instructed for it. Plaintiff is here assigning this ruling as error. Defendant by cross-appeal urges. that its demurrer should have been sustained.

Since we agree with the District Judge that a verdict should have been directed, the cross-appeal is dismissed. These are the facts viewed in the light most favorable to plaintiff's case.

The defendant was engaged in the business of operating a gasoline and oil filling station, and a general service station for automobile polishing, body and fender work, painting, washing, oiling, greasing, and otherwise servicing automobiles. In connection with this business it did a small parking business, having from four to twelve regular parking customers and sometimes as many as thirty occasional parkers during the evening performance of a nearby theater. Tolchin, about six weeks before the accident, had made an arrangement with the office of the defendant for night parking, paying therefor $3 by the month. At the time he made his arrangements for parking no particular space was

assigned him. There was testimony, though, that when he began parking with defendant one of the attendants told him to park in front of the grease racks. The same attendant testified further that, because this space was crowded and Tolchin could not get in there sometimes, he said "I want a place where I can park my car where I can get it and can get in any time"; that he told Tolchin, "All right drive as far as you can on the grease ramp and leave your key in the car and if we need the grease ramp we can drive it out." These elevated grease racks or ramps were in the center of what was known as the merry-go-round washing machine building. They were built over a big pit just behind a wide concrete floor extending from the front entrance back to it. This pit was used for greasing cars parked on the ramps over it. Cars were placed on them by driving them up wheelways leading from the edge of the concrete floor. These wheelways made a gradual ascent to a heighth of one and a half feet or more where they leveled off. Underneath the wheelways used by a single car there was an opening so that the cars could be greased from beneath by a person standing in the pit. Between the wheelways used by the left wheels of one car and the right wheels of the next were walkways made of iron crossbars approximately three-eighths of an inch thick, spaced at intervals of approximately one inch. These walkways gradually became narrower from the rear toward the front.

There was evidence, too, that not only Tolchin but other customers had been permitted to go into the merry-go-round building where the grease pit was and park their cars on the grease ramps, though defendant's officers swore that this was not permitted and that they did not know it was being done. There is no question, however, but that these racks were not intended for parking, that their real purpose and the real use to which they were put was for greasing cars, and that, if Tolchin had permission to park there, it was a personal and special one for his convenience and accommodation, for he had already contracted for parking in the regular parking spaces. These parking spaces were normally outside on the parking lot, though the customers did at times, when that space was crowded, park inside the various buildings. On the parking lot proper, the open parking lot in between the buildings, there was no sign designating just where cars should park, and none prohibiting persons from entering the merry-go-round building, neither was there any chain, guardrail, or sign across that building in which the grease ramps were located or across the ramps to warn persons from driving on them, and it was customary for persons to park on the floor of the building.

As above stated, Tolchin had first been told he could go onto the floor, had found the place crowded, and, following Mack's direction to park on the ramps, after that had made it a habit to park there. According to his custom or routine of parking, he usually arrived to park his car at any time after 6 o'clock, left his car on the grease ramps, and came to get it next morning at from 8:30 to 9 o'clock.

Jeff Minton, the greaser on the ramps, testified that he knew that Tolchin parked there, and knew that other cars parked there, and that the assistant general manager knew that Tolchin did. He testified, too, that one night Tolchin had taken his key out of the car with him, and that, when Tolchin came to get his car next morning, Minton had told him it was all right to park on the ramp but to leave his key in the car. The grease pit foreman, too, knew that Tolchin parked on the grease ramps.

On the night of the accident, June 8, 1934, Tolchin invited Miss Morse to ride with him to get something to eat. On their return from the eating place he told her that he would either take her back to her hotel or by the garage where he parked his car. She elected to go with him to park his car. Tolchin drove into defendant's premises by the filling station on back to the parking lot and entered the merry-go-round building where the accident occurred. It was completely dark in the building. No lights were burning, except the head and tail lights of Tolchin's automobile. He testified that he drove over the concrete floor toward the grease racks, which were directly in front with his bright lights burning. He testified, too, that it was perfectly apparent, with these bright lights on, that these were grease pits. He drove up on the grease rack, stopped his car, got out on his side intending to help Miss Morse alight, and told her, "Just wait a minute, I will be around." He left his lights on on his car casting a dim reflection on the walkway, and started walking

over the walkway on his side toward the front of the grease rack to assist Miss Morse. She, however, not waiting for him to assist her, got out of the car and started along the walkway on her side of the car. When he had reached and she had passed the rear end of the car where the open pit showed, Tolchin heard Miss Morse cry out, looked her way, and saw her falling. She was carrying articles in her hands at the time, but just how many is not made clear. Tolchin, who was the only witness to the accident, did not testify as to what caused her to fall. He said only that she appeared to stumble and fall sideways and backward into the pit.

Appellant offered evidence that some of the cross-bars which made up the walkway were sprung or bent and the nuts in some of them loose so that wider spacing actually existed between the bars than the one inch intended when the ramp was laid down. He points to some green paint on the inside of the deceased's shoe, also to a greasy imprint of one of the bars on the hollow of the shoe as evidence that her heel had slipped down into a space between the cross-bars of the walkway, and contends that these marks could not have been made unless the heel had slipped down through the bar space to allow the hollow of the sole to contact the bar. He insists that this was sufficient evidence for the jury to find that the cause of the falling was the defective condition of the walkway.

He insists that upon these facts defendant owed Tolchin as an invitee, through his parking on the ramp, the duty to maintain the walkway in such a condition as that a person could not be made to stumble by his heel slipping, and getting caught, between the bars; that this invitation extended to Miss Morse when she accompanied him to the place.

Appellee insists that under the Georgia Code[1] and the Georgia decisions Miss Morse was a mere licensee, to whom the company owed no duty of care, and that, it being indisputable that there was no wanton or reckless act on its part, no cause of action is shown. It insists that under this section Miss Morse could not be other than a licensee even if she had been expressly invited by the occupant of the building to come on the premises, for she came not on the company's business, but on her own pleasure and for a reason entirely disconnected with the business in which appellee was engaged, and as to which there was no "mutuality of interest" between her and appellee. Hall v. Capps, 52 Ga.App. 150, 182 S.E. 625. It insists, further, that an invitee, that is, one who goes on premises for the business of, and upon the invitation of, the owner, cannot in Georgia extend that invitation to another coming along only for his own convenience or pleasure, citing Petree v. Davison-Paxon-Stokes Co., 18 Ga.App. 490, 118 S.E. 697, a child accompanying her mother to a store; Atlantic & West Point R. R. v. Hyde, 45 Ga.App. 548, 165 S.E. 466; Id., 47 Ga.App. 139, 169 S.E. 854; Kinnebrew v. Ocean Steamship Co., 47 Ga.App. 704, 171 S.E. 385, persons coming to the premises of carriers merely for their own pleasure or convenience to see passengers but not to assist them or to become passengers themselves. See, also, Bynum v. Mayor of City of Savannah, 33 Ga.App. 502, 126 S. E. 857; Todd v. Armour & Co., 44 Ga. App. 609, 162 S.E. 394.

Appellee, while insisting that the Georgia statute and decisions control this case without regard to the state of the law elsewhere, cites in support of its position Murphy v. Huntley, 251 Mass. 555, 146 N. E. 710, 37 A.L.R. 1447, a case holding that one invited to ride with the owner of an automobile, who went with him to the garage where the car was stored, and was injured there, was a mere licensee and not entitled to recovery except for the reckless, wanton, and willful conduct of the garage owner. He cites, too, Rhode v. Duff (C. C.A.) 208 F. 115, an injury in a garage to one accompanying a patron there.

Appellant argues that all the cases appellee cites, both from Georgia and without it, are special cases, turning on their special facts, which show want of mutuality of interest between the suitor and the sued. He urges that none of them reach this case, which is one of a person going on premises in the car, and with the special invitation, of one who goes there under a contract right to park his car. He insists that even under the restrictive Geor-

---

[1] "A licensee is a person who is neither a customer, nor a servant, nor a trespasser, and does not stand in any contractual relation with the owner of the premises, and who is permitted expressly or impliedly to go thereon merely for his own interest, convenience or gratification. The owner of such premises is liable to a licensee only for wilful or wanton injury." Section 105-402, Georgia Code 1933.

gia rule a case for liability was made out under the rule prevailing there that an invitation is extended by carriers to persons coming on premises for the purpose of assisting passengers to embark or to alight. Central of Georgia R. Co. v. Hunter, 128 Ga. 600, 58 S.E. 154. He cites, too, in support of his general proposition that the facts present a case of mutuality of interest, Comment (d), section 332, Torts Restatement,

"d. Visits incidental to business relations of possessor and Third Person.

"It is not necessary that the visitor should himself be upon the land for the purposes of the possessor's business. The visit may be for the convenience or arise out of the necessities of others who are themselves upon the land for such purpose. Thus those who go to a hotel to pay social calls upon the guests or to a railway station to meet passengers or bid them farewell are business visitors, since it is a part of the business of the hotel keeper and railway to afford the guests and passengers such conveniences. So too a child taken by a mother or nurse to a shop is a business visitor; and this is so irrespective of whether it is necessary for the customer to take the child with her in order to visit the shop."

He counters appellee's citation of Murphy v. Huntley by citing two later cases from Massachusetts, Pope v. Willow Garages, 274 Mass. 440, 174 N.E. 727, Kelley v. Goldberg, 288 Mass. 79, 192 N.E. 513, and a case from New York, Warner v. Lucey, 207 App.Div. 241, 201 N.Y.S. 658. In each of the Massachusetts cases there was a finding that the owner of the premises had expressly invited the injured persons to come thereon and had done this in connection with the furtherance of the owner's business. In these cases Murphy v. Huntley was neither overruled nor disapproved, but properly distinguished, because in the Huntley Case there was no express invitation; in the two later cases there was. In the New York case plaintiff was injured by the elevator used by customers and those accompanying them to reach the upper parking floors on which cars were stored. The suit was brought and judgment given against the lessor and lessee of the premises. The court held that "the garage was intended by the lessor and tenants for public patronage to be used by any one who applied and paid for the storage of his car. It was a public use

or place as is an inn or warehouse. Plaintiff was in the position of a patron properly on the premises." In none of the cases appellant cites were the facts at all the same as those in the case at bar. Here there was no express invitation extended to plaintiff's decedent to go upon the ramp. There are no facts out of which mutuality of interest between her and appellee can be raised. It is a case of one voluntarily going into a place where she had not been invited by the owner to go, entirely for her own convenience and pleasure.

In Torts Restatement, § 332, comment (b), it is said: "In determining whether a particular person is a business visitor of a possessor of land, the important thing is the desire or willingness to receive that person which a reasonable man would understand as expressed by the words or other conduct of the possessor."

Nothing in comment "d" that "it is not necessary that the visitor should himself be upon the land for the purposes of the possessor's business," but "the visit may be for the convenience or arise out of the necessities of others who are themselves upon the land for such purpose," at all conflicts with this. By the two comments together it is meant to say that where, by express invitation or by facts from which reasonable minds might find an invitation intended, the owner has in his own interest invited persons to come on his premises for the pleasure, convenience, or business of his customers and patrons, the persons so coming are business visitors, having the same status as those who have come there under contract, with or on the business of the owner.

We do not understand that the Georgia Code and decisions are to a different effect. They merely make it clearer than some decisions and discussions do, that it is not the form of the invitation, that is, whether it is expressed or implied, but the circumstances under which it is given, that is, the presence or absence of "mutuality of interest" between the owner of premises and the visitor to them, which determines the status of the visitor; whether, in short, he is, as the Restatement puts it, a gratuitous licensee or a business visitor, or, as the Georgia courts put it, a licensee or an invitee.

In the syllabus to Hall v. Capps, supra, the Georgia rule is thus stated by the court which prepared it:

"1. 'Where the owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries occasioned by his failure to exercise ordinary care in keeping the premises and approaches safe.' Code of 1933, § 105-401.

"2. 'To the licensee, as to the trespasser, no duty arises of keeping the usual condition of the premises up to any given standard of safety, except that they must not contain pit falls, man-traps, and things of that character;' the duty of the owner or occupier of the premises being merely not willfully or wantonly to injure him by deliberate act, or by negligence in permitting some extraordinary concealed danger to exist and failing to warn him thereof. Mandeville Mills v. Dale, 2 Ga.App. 607, 610, 58 S.E. 1060; Rollestone v. Cassirer & Co., 3 Ga.App. 161, 166–172, 59 S.E. 442.

"3. It is well settled that in order for a visitor to occupy the status of an implied invitee, as distinguished from a mere licensee, 'he must come for a purpose connected with the business in which the occupant is engaged, or which he permits to be carried on there. There must at least be some mutuality of interest in the subject to which the visitor's business relates, although the particular thing which is the subject of the visit may not be for the benefit of the occupant.' Central of Georgia R. Co. v. Hunter, 128 Ga. 600, 604, 58 S.E. 154; King v. Central of Georgia R. Co., 107 Ga. 754, 760, 33 S.E. 839; Jones v. Asa G. Candler, Inc., 22 Ga.App. 717, 719, 97 S.E. 112; all quoting with approval from Plummer v. Dill, 156 Mass. 426, 31 N.E. 128, 32 Am.St.Rep. 463. Like rulings as to implied invitees have been made in Crossgrove v. Atlantic Coast Line R. Co., 30 Ga.App. 462 (1, a) 118 S.E. 694; Petree v. Davison-Paxon-Stokes Co., 30 Ga.App. 490, 492, 118 S.E. 697; McCall v. McCallie, 48 Ga.App. 99, 101 (8), 171 S.E. 843.

"4. The same rule as that just stated obtains where, as in this case, a visit is made on express invitation, but the purpose of the visit is wholly disconnected with the business in which the occupant is engaged. Such an invitee occupies the status of a mere licensee. This ruling is dealt with in the opinion."

We do not understand the rule as thus stated to be different from that generally prevailing throughout the states. We believe that any apparent differences will be found to reside in the facts of the cases rather than in the rule by which they are decided. But, however this may be, and whether under the rule of any other jurisdiction it might be said that a case is made out here, we think it plain that none was made out under the Georgia Code and decisions, for plaintiff's decedent, while not a trespasser, was neither a customer nor a servant, nor did she come on the premises under any circumstances from which it could be reasonably found that there was any "mutuality of interest" between her and the owner. The most that can be said of her case is that she went upon the ramp for her own interest, convenience, and gratification.

When it is considered that Tolchin's own use of the grease ramp was a mere permissive one, instituted by him for his own convenience in order to get his car out quickly, after he had already made his contract for, and had commenced, parking on the floor, it is clear, we think, beyond question that there is no basis here for finding the requisite mutuality of interest between defendant and plaintiff's decedent, who drove onto the ramp merely to be with Tolchin. The record is devoid of words or conduct on the part of appellee from which a reasonable person would understand that it had expressed a desire or willingness to receive on that grease ramp a person having no business there with appellee, or with any one whom the appellee had invited to conduct any business there, except that of parking his car. Especially are there no words or conduct from which it could reasonably be inferred that appellee had invited plaintiff's decedent, a woman with the small and narrow heels which women wear, to go upon the ramp and try, in the dark, to come down a greasy, slippery walkway, made for heavy shoes and heavy going in the business of greasing cars.

■ ·We are further of the opinion that, if plaintiff's decedent could, under Georgia law, be considered an invitee, the verdict was still rightly directed, for a case of death by negligence was not made out. All that was shown was that, while voluntarily walking in the dark, down a greasy walkway made by fixing rods one inch apart, because of the grease the workers with their heavy shoes would be bound to bring on it ana necessarily affording a

slippery and insecure footing, she fell, from some cause unknown.

Appellant admits that there was no duty to deceased to keep the walkway free of grease, none to light the building, and that, if she slipped and fell because of the darkness of the building, or of the grease on the walkway, she could not recover. He seems to think that without any proof as to what actually caused her to fall he has made out a case by showing that some of the rods were loose and bent so that there were spaces wide enough to permit the heel of a woman's shoe to go through, and that this might have caused her to fall. There is, it is true, a showing that there was some paint on the inside of one heel and grease on the hollow of that shoe next to the heel, indicating that the side of the heel and the hollow of the shoe had at some time come in contact with the rods, but there is no showing as to when or how this occurred, none that it was not the result of striking as she fell, none that she fell at a place where there was, or because, or on account of, unusually wide spacing.

Upon such a record no verdict finding that negligent causation had been established could stand.

The direction for defendant was right. The judgment is affirmed.