SAM STEVENSON, Appellant, v. KANSAS CITY SOUTHERN RAILWAY COMPANY.—159 S. W. (2d) 260.

Division One, December 12, 1941.

Rehearing Denied, February 26, 1942.

*Frank Benanti, Ben Mossel* and *Roy W. Rucker* for appellant.

*Cyrus Crane, Winston H. Woodson* and *James F. Walsh* for respondent.

HYDE, C.—This is an action for damages for personal injuries. Plaintiff had a verdict for $12,500. The court sustained defendant's motion for new trial on the ground "that the court erred in overruling defendant's demurrer at the close of all the evidence, and in denying the motion of defendant at the close of all the evidence for a directed verdict." Plaintiff has appealed from this order.

Plaintiff was injured by the collapse of a building, under construction by a contractor to whom defendant had let this work. The case was submitted upon defendant's negligence in preparing and furnishing plans and specifications, for the building, "defective in that the piers and walls which were specified were so designed that they did not and could not stand under the tension or side strain to which they were subjected." Defendant contends that there was no evidence of such negligence, and had evidence tending to show negligence in construction by the contractor. Defendant further contends that plaintiff cannot recover because he was (under the most favorable view of the evidence) a bare licensee (defendant contends he was a trespasser) to whom defendant owed no duty concerning the negligence charged. Plaintiff's claim is that he was an invitee. Therefore, the matter of plaintiff's status is decisive on the demurrer to the evidence.

Plaintiff's evidence on this feature of the case showed that defendant had let a contract, to the Fogel Construction Company (hereinafter called the contractor), for building a freight depot in Kansas City. One provision in this contract was:

"6. Neither this agreement nor any interest herein shall be assigned by the Contractor, nor shall any part of said work be sublet by it, without the written consent of the Railway Company."

The specifications further provided:

"7. The Contractor is to have full charge of his part of the work on building until completed, and he will be held responsible for ▇▇▇ all damage to his work, no matter by whom caused."

Plaintiff was a steel painter. Early in February, 1940, he went to the contractor to apply for work. The contractor told him that they intended to sublet the painting to Raymond Schmidt. It was shown that on February 21, 1940, Schmidt made a written proposal "to furnish all labor, material, equipment and insurance necessary to complete the painting . . . according to plans and specifications" at the fixed price. This proposal was accepted by the contractor on February 22nd, but this subcontract was never approved by defendant. There was no evidence to show that defendant was ever asked to approve it or had any information about it, prior to the collapse of the building on March 6, 1940. Plaintiff did not know Schmidt, but was given his telephone number by the contractor. Thereafter, plaintiff called Schmidt by telephone and was told by Schmidt that he had been given a favorable reference by the contractor and that he would give him the job. Schmidt said: "As soon as the job is ready I want you to work for me." Plaintiff saw Schmidt, for the first and only time, on the street about the middle of February and talked to him again about the job. Schmidt said "it would be ready pretty soon." He offered plaintiff another job on a storeroom downtown, but plaintiff said "no, I will wait for the other job." Schmidt said "you keep in touch with me either at home or down at the job." Plaintiff talked to Schmidt by telephone the latter part of February, which was the last time he talked to him. Schmidt said "the job will be ready in a short time, you keep in touch with me on the job. . . . You come down on the job whenever the work is ready to start."

On March 6th, plaintiff went to the Kansas City Structural Steel Company, which had the subcontract for the steel work. He was told there that they would be ready for him (to start painting) in a short time. It was suggested that he might go down to the job and see about it. He went to the building that afternoon. He saw the foreman for the Steel Company and told him he was looking for Schmidt. Plaintiff was told that Schmidt had some men working at the Loose-Wiles building across the street. The Steel Company foreman told him "we are figuring on getting done in a couple of days. You can start any time. We will get out of your way." Plaintiff also saw the superintendent for the contractor (he did not know his name but said a City Building Inspector there told him he was the superintendent) who said: "I understand you are going to work here." Plaintiff said: "Yes, as soon as you get ready for us." He said: "They are ready now." Plaintiff also said to the contractor's superintendent: "Is the woodwork going to be painted," and

he said, "no, just the steel only." Plaintiff went over to the Loose-Wiles building to see Schmidt, but, on inquiry of his painters working there, learned that he was not there. After plaintiff failed to find Schmidt he came back to the building and went in to "look around, see how much work had to be done there." Plaintiff said: "I figured out how long a panel was and the easiest way for me to get the painting done and the quickest and I stood there four or five minutes and figured out the needle beams and the end planks and ladders." While plaintiff was standing in the building, it collapsed and he was injured.

Plaintiff said that he worked by the day and understood Schmidt would pay him, on that basis, according to the Union scale, although there was no definite agreement about how he would work or what he would be paid. Schmidt never did call plaintiff or tell him the job was ready. Plaintiff never talked to anyone connected with defendant about the building or the painting. Plaintiff's understanding about his work was that he "was going to do it for Mr. Schmidt," and that his pay would come from Schmidt.

██ ██ The rule in this state is that "the owner or occupier of premises lies under no duty to protect those from injury who go upon the premises as volunteers, or merely with his express or tacit permission, from motives of curiosity or private convenience, in no way connected with business or other relations with the owner or occupier;" but that "a bare licensee (barring wantonness or some form of intentional wrong or active negligence by the owner or occupier) takes the premises as he finds them." However, this is not the rule "when the owner invites the use of his premises for purposes connected with his benefit, pleasure and convenience." In that situation, our rule is "that a licensee, who goes upon the premises of another by that other's invitation, and for that other's purposes, is no longer a bare licensee," but "becomes an invitee, and the duty to take ordinary care to prevent his injury is at once raised, and for the breach of that duty an action lies." ██ [Glaser v. Rothschild, 221 Mo. 180, 120 S. W. 1.] We have also said that "the status of an invitee will not be accorded by permission to enter on or use the property, in the absence of any real benefit to the owner." [Gilliland v. Bondurant, 332 Mo. 881, 59 S. W. (2d) 679, l. c. 688; see also Savage v. C., R. I. & P. R. Co., 328 Mo 44, 40 S. W. (2d) 628; Liability of a Possessor of Land in Missouri to Persons Injured While on the Land—McCleary, 1 Mo. Law Rev. 45, l. c. 59.] Thus, the real test of the status of invitee (to whom the owner has the duty to take ordinary care to prevent his injury) is the purpose of his visit. [See 20 R. C. L. 69, sec. 60; 45 C. J. 812, sec. 221.] One cannot be declared the invitee of the person sought to be held liable, for failure to exercise due care to prevent his injury, unless he was there for some purpose of real benefit or interest to such person.

The American Law Institute Restatement of Torts, although using

different terminology, makes its classification upon the same basis. Section 332 defines a "business visitor" as "a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them." This includes "those who come upon the land for a purpose which is connected with their own business which itself is directly or indirectly connected with any purpose, business or otherwise, for which the possessor uses the land" such as "a delivery man of a provision store while delivering goods to a residence" or "a workman who comes to make alterations or repairs." [Section 332, Comment A.] As to business visitors, the owner or possessor is liable for certain conditions which cause them bodily harm, not only when he knows of them, but also if he "by the exercise of reasonable care could discover the condition." [Section 343.] "Any licensee other than a business visitor" is classified as "a gratuitous licensee." [Section 331.] This includes persons "whose presence on the land is solely for the licensee's own purposes in which the possessor has no interest." [Comment A, Section 331.] As to such persons, the rule is that the owner or possessor owes a duty as to unsafe conditions (the risk of which he realizes) "only if he knows of the condition." [Section 342.] He "owes to a gratuitous licensee no duty to prepare a safe place for the licensee's reception or to inspect the land to discover possible or even probable dangers." [Comment C, section 342.] Even this rule, as to known conditions, goes beyond the Missouri rule that such a licensee "takes the premises as he finds them." [Missouri Annotations to Restatement of Torts, Sec. 342; see also comment on Mann v. Pulliam, 344 Mo. 543, 127 S. W. (2d) 426, in 4 Mo. Law Rev. 470, and in 5 Mo. Law Rev. 478-79.]

An illustration of the Restatement's rule, that there is no duty of inspection is given under Comment C, Section 342, where B, who is a gratuitous licensee, must, to get into the premises of A, travel a private road "dangerously undermined at a point where it runs along an embankment." If "A does not know that the road has been undermined but could have discovered it had he paid attention to the condition of his road, A is not liable to B." [For such a case see Di Marco v. Penna. R. Co., 321 Pa. 568, 183 Atl. 780; see also Higgins v. Mason, 255 N. Y. 104, 174 N. E. 77; Brinkmeyer v. United Iron & Metal Co., 168 Md. 149, 177 Atl. 171; Flanigan v. K. C. Southern R. Co., 276 Mo. 656, 208 S. W. 441.] Certainly, there is nothing in the evidence herein to show that defendant had actual knowledge or realization of any unsafe condition of the building which would be likely to cause its collapse.

It has been generally held that persons entering an employer's premises merely to see an employee, on business not connected with that of the employer, are not invitees or business visitors of the employer. [Gotch v. K. & B. Packing & Provision Co. (Colo.), 25 Pac.

(2d) 719, 89 A. L. R. 753, and cases cited in Annotation 89 A. L. R. 757; see also 45 C. J. 822, sec. 232.] There is no reason why the same rule should not apply to such visitors of a subcontractor. [It has been held to apply to the guest of a customer of a parking lot, parking in an unusual place. Morse v. Sinclair Automobile Service Corp. (USCCA), 86 Fed. (2d) 298.] A recent Virginia case held that even an employee of a subcontractor was a mere licensee in using a scaffold, of the general contractor, which was a convenient way, but not the only way or the safest way, to go to the place on the roof where he was required to work. [Pettyjohn & Sons v. Basham (Va.), 100 S. E. 813, 38 A. L. R. 391.] In view of all of these authorities, certainly plaintiff would not have been an invitee or business visitor of defendant, the owner, if his evidence only showed that he was in the building, for some purpose which was for his own convenience, information or profit, before the subcontractor commenced his work there.

 The situation here was that the building was still under construction and in the possession of the contractor for that purpose. The contractor was obligated by his contract to do the painting. Of course, the contractor's employees (doing such work) would have the status of defendant's invitees or business visitors, because this would have been a purpose of benefit to defendant. Undoubtedly the employees of a subcontractor (doing such work), if his subcontract had been approved by defendant, would have the same status. [See Haefeli v. Woodrich Eng. Co., 255 N. Y. 442, 175 N. E. 123.] However, defendant expressly reserved the right to approve or disapprove subcontracts, which was in effect the right to extend an invitation (for business purposes) to a subcontractor and his employees. Certainly, this provision might have been waived, by conduct or otherwise, but there was no proof of waiver. Neither was there any proof that defendant had any knowledge of this subcontract or of any intent or desire on the part of the contractor to make such a subcontract. [For a case where work was being done without the possessor's permission see Forsythe v. Shryack-Thom Gro. Co., 283 Mo. 49, 223 S. W. 39.] Moreover, plaintiff was not yet an actual employee, on the job, of the subcontractor, when he was injured. He only had the promise of the subcontractor that he would be employed there when the job was commenced. The job was not commenced, the subcontractor was not there to commence it, and there was no evidence to show when he intended to commence it. Perhaps he did not intend to commence until the subcontract was approved. Even though the contractor was ready for the painting to commence, since the subcontractor was to furnish all paint, material and labor (with right to direct the work), plaintiff could not have commenced work until the subcontractor was ready for him to commence. The evidence conclusively shows that the subcontractor was not ready to commence the work

on the day plaintiff was injured, and had not told him to be there then or fixed any time for him to begin work. Therefore, the only reasonable conclusion is that plaintiff went into the building solely for his own purpose to see how much there was to be done and to determine how long he might be employed in doing it. He was not sent there by any one to make an estimate. He had not been requested to determine anything. The subcontractor had already made his own estimates and made a bid which had been accepted. The only purpose plaintiff could have had (as appears from the evidence) was to find out for himself how long he would be employed, the most convenient way for him to work, or how much he would be able to earn from this job. We cannot hold that plaintiff was an invitee or business visitor of defendant, in its building, when defendant had never had an opportunity to pass upon the matter (as it had reserved the right to do) of whether his prospective employer should have the right to take his employees into the building for business purposes, and especially when plaintiff had not even been sent into the building by his prospective employer. We hold that the time when his status as such could commence had not yet arrived.

The order granting a new trial is affirmed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.