STELLA GOEDECKE v. SAMUEL W. GRALNICK and MUTUAL BANK AND TRUST COMPANY, a Corporation, Defendants, MUTUAL BANK AND TRUST COMPANY, a Corporation, Appellant.—No. 38997.—190 S. W. (2d) 218.

Court en Banc, September 4, 1945.

Rehearing Denied, November 5, 1945.

*Bryan, Cave, McPheeters & McRoberts* and *Joseph H. Grand* for appellant.

*Douglas H. Jones* for respondent.

ELLISON, J.—Suit in equity by respondent to enjoin the appellant bank from foreclosing under power of sale a deed of trust securing $14,000 in notes, hereinafter called "The Brody first loan." Respondent contended the notes had already been *paid* by the bank out of the proceeds of a $45,000 note she had given it. The bank ad-

mitted it used those funds in acquiring the Brody loan, but maintained it was only a *purchase* for the benefit of a "building fund" and collateral pledge account, which respondent had set up with the bank to secure the payment of her own $45,000 note. The bank also filed a counterclaim for a balance of about $35,000 on respondent's $45,000 note.

The principal issue in this case is whether the issues are res judicata, as plaintiff-respondent contends, because they were decided in two other cases between the same parties decided by this court in 1942, namely: Mutual Bank & Trust Co. v. Stella Goedecke, 348 Mo. 1164, 159 S. W. (2d) 258; and (same title) 159 S. W. (2d) 260. The trial court in the instant case first held the issues were not res judicata under those decisions. Then it sustained respondent's motion for a new trial on the express ground that those two prior decisions did make the issues res judicata. The defendant bank appealed from that order.

The factual background behind all three cases is as follows. The respondent owned a lot and building in St. Louis, subject to three mortgages: the Brody first loan for $14,000 involved in this suit; a Kohn second loan for $2500; and a Wulf third loan for $6500. Respondent desired to remodel the building, and arranged to finance it to the extent of $45,000 in the following manner. The appellant bank was unwilling to make a long time real estate loan but arranged for a commitment by the Phoenix Mutual Life Insurance Company (hereinafter called the Phoenix Co.) to make a $45,000 long term (20 year) real estate loan on condition that it be a first loan (i. e., that the three existing mortgages be paid off); and that the building first be remodeled in accordance with certain plans and specifications, and be free of mechanics' liens.

The bank agreed temporarily to advance the $45,000 on respondent's short term six months note for that amount, which she executed on October 3, 1939. Attached thereto was a "Collateral Pledge Contract." This contract was a regular printed blank form, and had a blank space for the listing of the property pledged, but no items were inserted at the time of its execution. Thereafter the bank rubber-stamped this space, the ink impression reading "Collaterals in their possession now or hereafter or any substitutes therefor. . . ." Respondent also, executed the long term $45,000 note to the Phoenix Co. and the mortgage securing it, which latter was recorded and delivered to the bank along with the unendorsed note. This loan was to be taken over by the Phoenix. Co. when its requirements had been met, and the proceeds used to pay the bank's short term note. Out of the latter the prior encumbrances were to be paid in the meantime.

Upon the execution of the respondent's short term note to the bank, it delivered to her a cashier's check for $45,000 which she immediately endorsed, and the proceeds were deposited in the bank

to the account of a ''Goedecke Building Fund.'' Checks thereagainst were required to bear the joint signatures of the respondent and the bank's officer in charge of the matter. Prior to his connection with the bank this officer had been in the sales engineering business. He participated in the selection of the building contractor and in the approval of the plans and specifications. He also retained general supervision over the building construction and the contractor's estimates to the extent of seeing that the money was properly disbursed.

Thereafter the bank took up the three senior mortgages, paying therefor over $23,000 out of said building fund, and retained them and their companion notes without releasing the mortgages of record. Still later more than $22,000 was paid out of the building fund on the remodeling of the building. Then disagreements arose between the respondent, the bank and the construction company which was doing the remodeling. The latter abandoned the job with over $11,000 in mechanics' liens outstanding. The Phoenix Co. cancelled its commitment, and the bank's short time note for $45,000 was left unpaid.

At this juncture the bank brought the suit in equity decided by this court in 1942 in the first case cited in the beginning. The second case was an off-shoot of the first, as will be explained presently. Since the question is whether the decision in that case made the issues here res judicata, we must state the issues tendered by the pleadings in the former suit. The bank's verified petition alleged therein that it had *purchased* (not paid) the three senior mortgages; that it was holding them in the order of their priority under the Collateral Pledge Contract, as security for the payment of its $45,000 short term note; that it was similarly holding the unendorsed Phoenix $45,000 note and mortgage; and that the latter constituted an equitable mortgage and fourth lien in favor of the bank.

The prayer of the petition was for an accounting and adjudication of the amount due the bank from the respondent on its short term $45,000 note; that the interests and rights of the bank as owner of that note, and as holder of the three senior mortgages and the Phoenix mortgage, be ascertained; that these mortgages be adjudged to have priority in the order named; and that the Phoenix mortgage be decreed an equitable fourth lien. Paragraph (7) of the prayer asked that the *first*, or Brody, mortgage be foreclosed and the real estate sold to satisfy the indebtedness due thereunder and under the liens junior thereto, all in their order; including the Phoenix equitable fourth mortgage and the respondent's short term note secured by the Collateral Pledge Contract; that the court appoint a special master to conduct the foreclosure sale; that the bank have a decree against respondent for the deficiency, if any; and for general relief.

The respondent's answer admitted she executed the bank's $45,000 short term note, the Collateral Pledge Contract and the Phoenix note and mortgage, knowing at the time that the real estate described in

the latter was not free from encumbrances. But she denied she had refused to pay any sums due, except mechanics' liens which she disputed; and further denied that she had any obligation under the three senior liens (the Brody, Kohn and Wulf notes) because her short term note was given to the bank upon the agreement that it would *pay* those notes and release their mortgages of record. She further alleged the Phoenix note and mortgage were unsupported by a consideration, because the Phoenix Co. had never advanced anything of value thereon. This was followed by a general denial. The prayer was for cancellation of all the notes and mortgages mentioned.

The trial court found for the bank on all the issues, but in Article XIII of its decree made a general order of sale (not under the Brody first mortgage alone) to satisfy the indebtedness due on the bank's $45,000 short term note. The real estate was sold by a special master under the decree, the respondent here appealing. It did not bring enough to satisfy the bank's short term note, and the bank filed a motion for a deficiency judgment. After a separate hearing the trial court rendered judgment for the bank on that motion in the sum of $22,803.38, and the respondent again appealed. It was on that record that the opinion in the second case, supra, 159 S. W. (2d) 260, was written.

The single record brought up for both the 1942 cases shows there was substantial evidence pro and con on the issues whether the Brody, Kohn and Wulf prior mortgages were *paid off* or merely *purchased* by the bank; and whether they were covered by the Collateral Pledge Contract. We need not go into that evidence or the evidence here, because the appellant bank concedes it was substantial in both litigations. Its defense is based on other grounds, namely: that the cause of action here is not the same as in the 1942 cases; that the doctrine of res judicata therefore applies only to such common issues as were tendered and directly determined in the former case; that this court in its 1942 opinions not only failed to rule, but could not properly have ruled, on the issue whether the three prior mortgages were purchased or paid.

The reason, says the appellant bank's brief, why this court could not have decided that issue in the former case is, that having held the bank was not entitled to equitable relief, the court could not retain jurisdiction to determine purely legal issues. Elaborating this contention the brief says the only fact that drove the bank into equity in the former case was that the Phoenix mortgage note had not been endorsed, thereby compelling it to sue in equity to establish the same as an equitable mortgage. If the note had been endorsed there would have been a pledge in law, as was true of the Brody, Kohn and Wulf mortgages. The latter were involved in the former suit only *incidentally*, and were included solely on the theory that equity having acquired jurisdiction would proceed to do complete justice.

We do not agree to this. The former suit involved much more than establishing ▮▮▮▮ the Phoenix loan as an equitable mortgage. As we have shown, the petition in that case prayed an *accounting* of the balance due the bank from the respondent on her short term note, and a determination of the bank's rights in the Brody, Kohn and Wulf senior mortgages. And it asked for the foreclosure of the Brody first mortgage—not the Phoenix equitable fourth mortgage it was trying to establish. Equity had jurisdiction to do that, Federal Land Bank v. McColgan, 332 Mo. 860, 59 S. W. (2d) 1052, 1054(5); and it would seem equity had the same power to establish and enforce (or not) the lien of the bank's Collateral Pledge Contract—certainly in the circumstances of this case. 30 C. J. S., sec. 60, p. 403; 21 C. J., sec. 96, pp. 118-9.

Plainly the situation was this. The bank had no security for the respondent's $45,000 short term note except the Collateral Pledge Contract; and its rights under that were disputed. If it had attempted to foreclose the three senior mortgages, the whole amount due on them was only about $24,000; and any surplus at the foreclosure sales would have gone to the owner of the equity of redemption. To capture that surplus it was necessary to establish the Phoenix loan as a junior equitable mortgage and thus extend the bank's liens to cover the surplus. The object of the suit was not alone that, but also to litigate all the disputed questions in one suit in a court of equity. The very selection of the Brody first mortgage for foreclosure, and the prayer that the proceeds be allocated first to it and the Kohn and Wulf mortgages, necessitated a judicial determination whether the bank held them under its Collateral Pledge Contract.

▮▮▮ But the point stressed by the appellant's brief is that neither of this court's 1942 opinions *decided* the bank had not purchased and held the Brody first mortgage as collateral security (that being the only mortgage involved in respondent's petition in the instant case). On the contrary, says appellant, both opinions throughout treated the case as dealing only with the Phoenix loan sought to be established as an equitable fourth mortgage. Appellant's brief points out that the first words in the first opinion are, "Action to decree an equitable mortgage . . . "; that it shortly afterwards states: "absent an intent to create a mortgage, a chancellor is without authority to decree an equitable mortgage;" and finally the opinion announces the conclusion: "Thus it appears that there is no evidence tending to show that defendant intended to create a mortgage in favor of plaintiff by executing and delivering the Phoenix Mutual note and deed of trust to plaintiff."

That is true; the foregoing language does appear in the first opinion. But the opinion also says that respondent (here) conferred with an officer of the bank (italics ours): "with reference to a bank loan to provide money to remodel the building and *pay* three notes secured

by three deeds of trust on the property." Again, speaking of the Brody, Kohn and Wulf mortgage notes and the Goedecke Building Fund account in the bank, the opinion states: "Shortly thereafter the three notes amounting to $23,917.84 secured by prior deeds of trust on the property were *paid* from this fund and delivered to plaintiff." Later the opinion quoted a bank officer in the narrative form testifying: "I also explained that the three prior deeds of trust on the property would be *paid* from the short time loan, and the deeds of trust securing said notes would be held by (the bank) and released of record at the pleasure of (the bank)."

And finally, after declaring there was no evidence tending to show respondent (here) intended to create a mortgage in favor of the bank by delivering the Phoenix mortgage to it, the opinion continues: "On the contrary, the evidence conclusively shows that plaintiff relied for security on its *control* of the $45,000 in the 'Goedecke Building Fund', its *supervision* through (its-officers) of the building construction, its *control* of the three notes secured by deeds of trust and its *control* of the Phoenix mortgage." And at the end, the whole judgment was reversed and the cause remanded with directions to cancel the special master's deed in foreclosure, purporting to convey the real estate to the bank. In the second case the deficiency judgment was reversed outright. There was no discussion of the issues—only a reference to the first case stating the court there "decreed an equitable mortgage."

Furthermore, after the bank's motion for rehearing in the first case had been overruled by this court, it filed two motions to modify. In both it asked that the word "paid" be stricken from the opinion and the word "purchased" be inserted in lieu thereof in two places. It argued the evidence conclusively showed the three senior deeds of trust were purchased and not paid, pursuant to an express agreement; and said this was important to the bank in order to prevent any misunderstanding that the opinion meant all three prior deeds of trust had been paid and cancelled.

One of these motions asserted that at one place the first 1942 opinion quoted a bank officer as using the word "paid", when actually he said "taken up." We have reexamined the record in that case, and find he did use the latter words. But it was in answer to a preceding leading question of his counsel which used the same words. Likewise, another bank officer testified to the same effect in that case. But he further said he had had correspondence with the respondent concerning the Brody and Kohn prior mortgages in the course of which she wrote him a letter (bank's Exhibit 15) on September 12, 1939, just three weeks before she executed the short term $45,000 note, in which she authorized him to pay the interest on the Brody first mortgage up to Feb. 1, 1940. He explained the necessity for this by saying: "The (Brody) deed of trust was being *paid* before maturity and it was necessary that we pay the interest to the next interest date." Again

he was asked: "And out of what account were these prior deeds of trust *paid for*"? His answer was: "Out of the Goedecke Building Fund."

Without going much further into this question, we will state that the same witness was asked if he "took up" the Kohn second mortgage, and he said he did. Then he was asked how much he "paid" for it, and he answered $2,525.84. In answer to questions similarly phrased he said he "took up" the Wulf third mortgage, and that he "paid" $6825 for that. If the bank officers used the same loose language in talking to respondent (for remember the agreement was oral) it is easy to see there well may have been no meeting of minds; although the bank officers intended at the time to *purchase* these three mortgages and hold them as collateral, and testified affirmatively after the collapse of the building project that such was the express arrangement.

Returning to the motions to modify. They further asked that a sentence be stricken from the first opinion which stated there was no evidence tending to show the parties *intended* to create a mortgage in favor of the bank by depositing the Phoenix loan with it. This request was supported by a long argument on the evidence. The motions additionally asked that the word "control", as used in the opinion, be stricken and the word "pledged" inserted, again reviewing the evidence. There can be no doubt that these vital parts of the opinion were brought to the attention of this court by these motions to modify, including the true meaning of the ambiguous words "taken up".

And yet this court overruled both motions; reversed the first case in toto and remanded it with directions to cancel the special master's deed; and reversed outright the second, or deficiency judgment, case; though it is true there was no express determination in either judgment of the status of the Brody, Kohn and Wulf senior mortgages. Following that the bank nevertheless started to foreclose the Brody first mortgage under the power contained in that deed of trust, notwithstanding it was the very same mortgage it had prayed to have foreclosed in the former case. It was then that the respondent brought the instant injunction suit.

Respondent relies on Hunter v. Delta Realty Co., 350 Mo. 1123, 1129 et seq., 169 S. W. (2d) 936, 939-40(9) as a controlling authority supporting her contention that the issues here are res judicata. That decision said (parenthesis ours): "It is immaterial that the (former) judgment did not expressly find against appellant on his claim for rents and profits accruing after judgment and pending delivery of possession pursuant thereto, because the effect of the judgment was to deny appellant's claim for such accruing rents and profits. [Citing cases.] 'The legal effect of the silence of a judgment on any part of a demand that might have been allowed under the pleadings is a rejection of such part of the demand, which has the effect of res

adjudicata against a subsequent action for that part.' 34 C. J. 818, sec. 1235.''

Appellant's brief asserts this Hunter case is not in point because the rule announced therein applies only where the second cause of action is the same as the first; and that when the two causes of action are different, the decision in the first will be res judicata in the second only as to issues actually decided, and not to issues which might have been but were not decided. We readily agree that is good law. In fact, the excerpt from Corpus Juris appearing in the foregoing quotation from the Hunter case is taken from a section announcing the first of those two rules. But what is the meaning of the phrase ''same cause of action''? It does not mean that both causes of action must be identically the same in scope, content, form and relief. 30 Am. Jur., sec. 172, p. 914, sec. 174, p. 918, secs. 175, 176, 177, p. 919; 34 C. J., sec. 1226, p. 805, sec. 1227, p. 806, sec. 1232, p. 813; 38 Words & Phrases (Perm. Ed.), p. 211.

Thus, in the Hunter case, supra, where the doctrine of res judicata was applied, the prior cause of action between the same parties had been in ejectment, whereas in the later case it was for the recovery of rent on the same land during a period subsequent to that covered by the first suit, but the claimant had failed to obtain an adjudication in the ejectment case of the value of the monthly rents and profits which would operate in futuro.

We think the prior cause of action decided by this court in the first case decided in 1942 was essentially the same as the cause of action here. Both were for the foreclosure of the Brody first mortgage on the theory that it was purchased by the appellant bank out of the Goedecke Building Fund account and to be held as collateral under the Collateral Pledge Contract. The only difference in the two cases was that in the former case the bank sought a judicial foreclosure to satisfy the lien of the three senior mortgages and the Phoenix mortgage, after establishing the latter as an equitable fourth lien; whereas in this case the bank, being precluded in that objective by the former decision of this court, was about to foreclose under the power of sale contained in the Brody deed of trust. The theory of liability was the same; the difference was in the extent of relief. We think the bank is barred not only as to issues raised in the former case, but as to issues that might have been raised—if the present issues were not raised there.

But even conceding the cause of action in this case is not the same as that in the 1942 cases, at least the same fundamental issue was common to both litigations. And if that issue *necessarily* was decided adversely to the bank in the former cases, it is res judicata here, even though the former judgment did not expressly determine it. In that event we must look to the pleadings and evidence to see what issues, ultimate or supporting, were passed upon. 34 C. J., sec. 1331, p. 923,

sec. 1332, p. 927; 39 Am. Jur., sec. 183, p. 928; State ex rel. Gott v. Fidelity & Deposit Co., 317 Mo. 1078, 1088(b), 298 S. W. 83, 87(3).

We think that legal principle is controlling here. Let it be granted tentatively, as the two dissenting opinions contend: that the parties legally could have agreed the bank should *pay off* the Brody, Kohn and Wulf senior mortgages and still retain a lien thereunder; and that the agreement made essentially was only that the bank should "keep the lien alive." And suppose it be similarly granted that some such underlying issue is implicit in the instant case (though never raised by the pleadings) so that we would now be warranted in holding on the *merits* that the trial court's order granting a new trial should be reversed and its original decree reinstated—as the dissenting opinions propose to do.

Even then, if such a broad, fundamental issue is implicit in this case, so was it in the first 1942 case—for the pleaded and evidentiary issues on the point are the same in both cases. And if that issue was in the former case, it was decided adversely to the bank. For the general judgment rendered was on the merits, reversed the whole cause, and cancelled in toto the special master's deed purporting to foreclose *all four* mortgage liens. This necessarily was a ruling that the bank had no lien under any of them: otherwise the sale would have been validated as to the liens upheld, and the question would have been on the disposition of the surplus. Furthermore, the 1942 opinion would not have held that the bank "relied for security" on its supervision and control of the building operations, money and papers. That statement in its context necessarily meant the bank did *not* rely on the prior mortgages as security, as attested by the ultimate ruling made. And certainly if this court had entertained any other view, it would not have overruled the bank's motion to modify the 1942 opinion, which brought out sharply the theory on which the bank now relies.

The dissenting opinions in effect concede the foregoing premises, but disagree with the conclusion reached. They hold the first 1942 decision is not subject to the interpretation we have just put on it. In fact one of them says "the former opinion recognized that these trust deeds were so held as collateral" (i. e., by payment of the three mortgages and reservation of a ▮▮ lien). This necessarily implies the 1942 case had in mind the existence of such a claim, 36 Words & Phrases (Perm. Ed.) "Recognize", p. 519. In other words, it was not overlooked but overruled—if the judgment rendered was broad enough to cover it.

But the theory of the dissenting opinions is not the theory of the bank's brief. It's main point III asserts the 1942 decision "not only did not rule . . '. but could not properly have ruled" on the issue whether the three prior mortgages were purchased or paid—because the only real issue decided there was whether the Phoenix loan

constituted an equitable fourth mortgage. Thus the bank seeks to avoid the issue of res judicata. It is true the brief later, in argument, says the only issue before this court now is whether the Brody first mortgage (alone directly involved here) was "legally pledged" to the bank. But that is on the theory that this court did not pass on it in the first case.

On the question of res judicata it seems to the writer there can be no doubt that the issues in the former cases were clear-cut and are preclusive here. The ·bank claimed the respondent had expressly agreed that it should "*purchase*" the Brody, Kohn and Wulf senior mortgages out of the Goedecke Building Fund and hold them as collateral. The respondent claimed the bank was to clear the land title by paying off *and discharging* the three mortgages and to defray building construction costs, both out of the Building Fund; and that when these preliminaries had been disposed of the Phoenix long term loan was to wash out respondent's short term note, which had financed the Building Fund; the bank officer in the meantime retaining joint supervision and control of the building plans and construction, disbursements, money and papers. This does not compel the conclusion that the three senior mortgages were to be held exclusively by the bank as collateral; it may have been to protect the title during the interval. Apparently everything would have worked out, but for the disputes and the fact that the contractor quit. The agreement should be viewed in the light of the mental approach of the parties at the time it was made; and not molded in the matrix of subsequent unanticipated events.

One of the dissenting opinions comments on the fact that the respondent never claimed the three mortgages or asked for their cancellation and release. On that point she testified in the instant trial below: that the bank asked her to send in the notes she had paid so the mortgages could be released; that a bank officer exhibited to her the certificate of title showing the mortgages unreleased, and said the title would go back for "posting" and they would be released; and that she didn't ask for them because she thought they were worthless, and didn't know they were not released until after the decision of the former appeal, when her attorney did make a demand.

At the trial of the 1942 case she testified she paid the three mortgages out of the borrowed money in the Building Fund, and that the bank officer said he would release them. She was not asked whether she had made a demand for the supposedly cancelled instruments. In both cases it was also proven that when respondent applied for the bank loan on her $45,000 short term note, the only collateral offered, as shown on the bank's own "Offered for Discount" slip, was the Phoenix long term loan as represented by the commitment therefor. The bank claims the agreement to pledge the three mortgages was made afterward when it learned of their existence—this though she

was an old borrowing customer, and her financial situation presumably would have been known.

We do not mean to imply there was not substantial and definite evidence to the contrary on this issue in behalf of the bank. The above facts are mentioned only to show the same issue was decided in both cases on substantial conflicting evidence; and not with any intention of reweighing the evidence. To do the latter, whether the 1942 decision be right or wrong, would be to repudiate the doctrine of res judicata —except in very rare cases. 4 C. J., sec. 3086, p. 1105; 5 C. J. S., sec. 1832, p. 1286; 34 C. J., sec. 1312, p. 902; sec. 1314, p. 905; 30 Am. Juris., sec. 198, p. 939, sec. 206, p. 943; U. S. ex rel. First Nat'l Bank v. Lufcy, 329 Mo. 1224, 1236, 49 S. W. (2d) 8, 14(7).

█ The bank's answer in this case introduces one issue which was not in the 1942 cases, namely: that on April 27, 1942 (after the opinion of this court in the first case had gone down) it sold the Brody notes and mortgage at public auction under the Collateral Pledge Contract, and bid them in at the sale out of its own funds. It claims by that procedure to have become owner, █ instead of pledgee, of the Brody mortgage with full right to foreclose as such under the power of sale contained in the mortgage. We cannot see how that evades the binding effect of the first 1942 decision. If the bank *paid* the Brody notes as held in that case, there was nothing to foreclose. And if the bank merely relied on its control of the Brody mortgage there was no pledge that could be legally foreclosed.

█ This appeal is from the order of the chancellor granting a new trial to the respondent on the theory that the lien issues are res judicata against the appellant bank. We have upheld that view in this opinion, but the appellant bank also filed a counterclaim seeking a personal judgment against the respondent for $28,106.73 with 8% interest from April 27, 1942, and $6750 attorney fees, the amount alleged to be due on her $45,000 short term note to the bank. Respondent by answer thereto disputes the amount claimed and prays an equitable accounting. Accordingly, the order of the chancellor granting a new trial is affirmed, and the cause is remanded with directions: to enter an interlocutory decree making the respondent's temporary restraining order or injunction perpetual, and ordering the surrender to her of the above mentioned Brody note, or notes, and the deed of trust securing the same; and to proceed with the trial of the issues on the appellant's counterclaim, and render a final decree, in harmony with this opinion as to the lien issues, at the conclusion of the whole case.

Affirmed and remanded with directions.

*Douglas, Gantt* and *Tipton, JJ.*, concur; *Leedy, J.*, doubtful; *Clark, C. J.*, and *Hyde, J.*, dissent in separate opinions.

■ CLARK, C. J. (dissenting).—I am unable to concur in the opinion of Judge Ellison. As I understand our two former opinions [348 Mo. 1164, 159 S. W. (2d) 258, 260] when they were rendered and as I read them now, the only question then decided was that no equitable mortgage was created in favor of the bank by the execution and delivery to it of the note and deed of trust made payable to the insurance company. I think that question was correctly ruled, but I fail to see how that ruling is res judicata as to the ownership of the Brody note. Judge Ellison's opinion says that the ownership of that note, as well as the Kohn and Wulf notes, was put in issue by the pleadings. If so, the trial court found that issue for the bank and we did not disturb the finding on appeal. True, our former opinion incidentally discussed some of the evidence relating to the three notes which were secured by deeds of trust on respondent's real estate when she began negotiations with the bank, but only as to whether or not such evidence indicated an intent to create an equitable mortgage in favor of the bank by the delivery to it of the note and deed of trust made payable to the insurance company.

Our former opinion [159 S. W. (2d) 258] starts with the statement: "Action to decree an equitable mortgage on land," and says that the question depends upon intent of the parties. Then the opinion recites that appellant there, respondent here, negotiated with the bank for a loan of $45,000.00 to pay off the three existing notes secured by deed of trust and to improve her real estate. It being against the rule of the bank to make long time loans on land, negotiations were had with an insurance company whereby it agreed to make the loan on a first deed of trust on condition that the property be improved in a certain manner and freed from mechanics' liens. Appellant executed a note in the sum of $45,000.00 payable to the insurance company and secured by deed of trust which was recorded and delivered to the bank, but the insurance company never paid out any money on this loan. Appellant executed a note for $45,000.00 to the bank and the proceeds were deposited to the credit of "Goedecke Building Fund," subject to the joint check of appellant and an official of the bank. Appellant also executed a collateral pledge contract. The entire building fund was consumed in taking up the three outstanding secured notes [payable to Brody, Kohn and Wulf, respectively] and in improving the real estate, leaving mechanics' liens to the amount of several thousand dollars unpaid. Our opinion states that those three notes were paid from the building fund and in another place quotes an official of the bank as saying: "I explained that the collateral for the short time loan must be a note and deed of trust on the land in favor of an insurance company and ■ an agreement from the company to purchase the loan when the building was completed. I also explained that the prior deeds of trust

on the property would be paid from the short time loan, and the deeds of trust securing said notes would be held by plaintiff [the bank] and released of record at the pleasure of the plaintiff.''

But the opinion also states that the deeds of trust securing the three notes were not released of record and that the notes, as well as the insurance company note, were held by the bank under the collatral pledge agreement. Then, in winding up the discussion of that branch of the case, the opinion says:

''Thus it appears that there is no evidence tending to show that defendant intended to create a mortgage in favor of plaintiff by executing and delivering the Phoenix Mutual note and deed of trust to plaintiff. Furthermore, it appears that there is no evidence tending to show that plaintiff so understood said execution and delivery of the note and deed of trust. On the contrary, the evidence conclusively shows that plaintiff relied for security on its control of the $45,000 in the 'Goedecke Building Fund,' its supervision through Vice-President Griffin of the building construction, its control of the three notes secured by deeds of trust and its control of the note and deed of trust executed by defendant in favor of the Phoenix Mutual Life Insurance Company, on which note the insurance company agreed with plaintiff to make a loan to defendant.''

Although our former opinion, in discussing the evidence in relation to the three notes, uses the words "pay" and "paid," it also says that the notes were held by the bank under the collateral pledge agreement and that the bank relied in part upon its control of the notes. Of course, the notes could not be governed by the collateral pledge agreement until the owners of the notes received the amount due them. If payment to the owners out of the building fund discharged the liability of Mrs. Goedecke on these notes and extinguished the liens of the deeds of trust there would be no advantage to the bank in holding them under the collateral pledge or controlling them. In other words the bank could not so hold or control the notes until the owners received their money, and afterwards there would be no reason for the bank to hold or control them unless Mrs. Goedecke was still liable for their payment or the deeds of trust were still in force. I think our former opinion indicates a view that the liability of Mrs. Goedecke on the three notes was not discharged. Certainly our opinion indicates that the parties intended to preserve the lien of the three deeds of trust as collateral security to the bank, and this could be done by agreement even though the notes be considered as "paid." [19 R. C. L., page 444, sec. 228; Pomeroy's Equity Jurisprudence, 5th Ed., page 172, sec. 797; Powell v. Jefferson Bank (Mo.), 96 S. W. (2d) 338; Gardner v. Switzer, 186 S. W. (2d) 561.] Be that as it may, we did not expressly decide those questions, nor did we impliedly decide them by holding that the execution of the note

and deed of trust to the insurance company constituted no equitable mortgage in favor of the bank.

In the instant case respondent procured a temporary injunction restraining appellant bank from foreclosing the Brody deed of trust. The bank filed answer and counterclaim. The trial court found for the defendant bank, dismissed plaintiff's petition and rendered judgment on the counterclaim, then granted a new trial on the express ground that our former opinion is res judicata.

I think the order granting a new trial should be reversed and the cause remanded with directions to reinstate the judgment.

HYDE, J. (dissenting).—I concur in the dissenting opinion of Clark, C. J. It is further my view that the controversy injected herein as to whether the notes (secured by the three original trust deeds) were *paid* or *purchased* is a sham battle over an issue wholly immaterial to the decision of this case. I think that the decisive issue is not whether these notes were paid by plaintiff or purchased by the bank, but is instead whether there was an agreement between the parties for keeping alive the lien of the underlying trust deeds as collateral security for the loan.

An owner of land, who is not personally obligated to pay the debt, can pay off an encumbrance thereon and still keep the lien alive for his own security only as against intervening encumbrances; and there is no merger, when even an owner primarily liable for the mortgage debt pays it with funds furnished by a third party, if they have an agreement to keep the lien alive. [See 3 Pomeroy's Equity Jurisprudence, 168-173, secs. 796-798.] I think the physical facts here (as well as the oral testimony) demonstrates that this was the intention of these parties. The notes were not cancelled, the deeds of trust were not released, the bank furnished the money with which these encumbrances were taken up, they were held with the collateral agreement and with every renewal thereof, and plaintiff never claimed them or asked for their cancellation and release. Moreover, the whole purpose of the transaction was to permit plaintiff to acquire and improve real estate, which was to be the ultimate source (by being the security for the Phoenix loan) of the funds for repayment of the $45,000.00 loan advanced by the bank until the money could be obtained on the security of this real estate.

It is inconceivable to me (from the way the transaction was handled) that there could have been any other intent than to keep these trust deeds alive as security for the loan, as has been twice held by trial courts which heard the evidence. It also seems to me that not only was there no decision in the first case against such a collateral agreement but on the contrary the former opinion recognized that these trust deeds were so held as collateral in the language quoted in the dissenting opinion of Clark, C. J. I do not consider as of any im-

portance the worries of counsel (as expressed in the motion for modification) over the use of the word "paid", because I feel that there could be no such issue in the case.

Furthermore, it seems to me that the principal conclusion upon which the majority opinion rests (and in my view the only conclusion upon which it could be upheld) is erroneous. This conclusion is that the judgment in the prior case necessarily passed upon the issue of the pledging of the three original deeds of trust, as collateral security, because it ordered the cancellation of the Special Master's deed which was based upon the foreclosure of all liens. I think the complete answer to this conclusion is that the decree had to correctly fix the total amount of the debt which was secured by the liens to be foreclosed. It had to do this because the owner had the right to stop the foreclosure by payment of the secured debt, and, therefore, had the right to have this amount correctly ascertained before there could be a valid foreclosure sale. She did not have to pay her total debt to the Bank (both secured and unsecured) to stop this foreclosure, but could do so by paying only the amount secured by the liens which could be foreclosed. Therefore, when our opinion in the former case, reduced the amount of her debt, secured by liens which could be foreclosed, from $55,944.50 (by holding that the Phoenix Mortgage was not a lien) to approximately $23,000.00 (the amount of the three prior mortgages) it necessarily was required to set aside the Special Master's deed. [See Jones on Mortgages, 8th Ed. sec. 2042; 42 C. J. 143, secs. 1738-1739; 37 Am. Jur. 76, sec. 592; Rumsey v. People's R. Co., 144 Mo. 175, l. c. 189, 46 S. W. 144; Sager v. American Investment Co. (Ark.), 280 S. W. 654, l. c. 656.] Thus the premise of the majority opinion, that this matter (of valid foreclosure under the three prior mortgages) could have been adjusted by a mere change in the order for distribution of the proceeds of the Special Master's sale, necessarily fails. Likewise its conclusion, that this Court by setting aside the Special Master's deed decided the question of three prior deeds being valid liens, also fails.

I think the order granting the new trial should be reversed and the judgment reinstated.